POLK COUNTY MEMORIAL HOSPITAL *v.* JOHNSON.

5-611                                    278 S. W. 2d 640

Opinion delivered April 4, 1955.

[Rehearing denied May 9, 1955.]

*Collins, Core & Collins* and *James D. Stoker,* for appellant.

*Nabors Shaw* and *W. G. Spencer,* for appellee.

GRIFFIN SMITH, Chief Justice. The appeal presents two issues: Did the appellee, who was defendant below, present substantial competent evidence to absolve himself from a written promise to pay? Should it be found that the evidence was sufficient, did the admission of incompetent testimony prejudice the plaintiff's rights?

On May 19th, 1952, John W. Hydrick, 86 or 87 years of age, was admitted to Polk County Memorial Hospital and assigned to a room for which the regular charge was $5.50 per day. Since 1940 Hydrick had been living with Gerald Johnson who owns a farm about fifteen miles from Mena. The Johnsons—husband, wife, and son—were the closest friends Hydrick had, and he was treated as a member of the family. Illness eventually became chronic, necessitating hospitalization for a short period in March, 1951; January, 1952; April 14th and May 7th, 1952, and finally on May 19th. The May 19th tenure continued for 53 days, or until July 11th, when Hydrick died.

There is evidence supporting the Hospital's contention that on August 28th following the patient's death a statement was sent to Johnson showing that he was charged with $898.65 for services rendered to Hydrick, against which there was a $50 credit representing a "welfare check" due the patient, but received by Mrs. Gerald Johnson and turned over to the Hospital July 9th. This left a balance of $848.65 for which suit was brought after Johnson had disclaimed liability.

A printed form recording admissions to the Hospital is used for entering essential information relating to the patient. The last line bears the imprint, "I hereby agree to pay for services rendered to this patient." This is followed by the words, printed boldly in capital letters,

"Signature of guarantor." Admittedly Johnson signed this guarantee—a transaction he undertook to explain through his own testimony and by calling several witnesses.

The court permitted the defendant to range widely on cross-examination, and allowed unusual latitude to the witnesses he called directly. Many of the questions and answers were objected to by appellant.

Preliminary to introduction of the May 19th admission sheet the plaintiff presented documents relating to former services. The first was March 19, 1951. Following "person responsible for this account," Johnson's name appears, but it is not contended that the writing is his signature. In a form for January 23d, 1952, no name appears, but the Hospital's memorandum is that Johnson should be notified in case of emergency. An April 14th entry is similar to the January record except that following "person responsible for this account" the word "welfare" had been written, then scratched through. The substitution was: "Not welfare—Gerald Johnson." This was not in Johnson's handwriting; nor is it claimed that he authorized the indorsement by express words. Following "person responsible" on the May 7th record Hospital authorities noted that Johnson was to be informed in case of emergency. His relationship was listed as "friend." Farther down, but not on the line showing Johnson's name, "pay on discharge" is preceded by "person responsible for this account."

The March 17th item was paid by Johnson. Hydrick was in the Hospital on that occasion about two hours and the charge was $5. The January charge of $71.25 was "taken care of" by the welfare department. In discharge of the April obligation Mrs. Gerald Johnson sent a check for $53.30. The May 7th debit, amounting to $49.90, was paid by Mrs. Johnson, but the jury would have been warranted in finding that she handled Hydrick's welfare checks during his periods of incapacity and that these were used in paying hospital charges.

When Hydrick's treatment began May 19th he was placed in a room for which the charge was $5.50 a day. On the 22d he was moved to a $7.50 room where he remained until changed to one costing $8.50 a day. A Hospital bookkeeper testified that the business office procured Johnson's consent to move the patient into the more expensive quarters, but this was denied by the defendant. Other Hospital witnesses did not know whether Johnson's approval was procured. Mrs. Johnson made daily visits to Hydrick, and Gerald made frequent calls. He admitted knowing that the patient had been moved to different rooms, but had no information regarding the cost.

Hydrick had a married daughter — Mrs. A. W. Brewer — who resided in Arizona. On June 4th, the Hospital wrote her, enclosing a statement of the account to the first of that month, saying: "Please send remittance, or let us hear from you in regard to this account." Mrs. Brewer replied (after the full account had been turned over to a collection agency) denying responsibility and expressing her belief that Hydrick was Johnson's employe and that he should pay the bill. This disclaimer appears to have been sent after the Hospital's board of governors placed the item with the credit bureau Nov. 2, 1952.

At trial the defendant's attorneys repeatedly stressed the fact that a subpoena *duces tecum* had been served upon one of the Hospital's responsible agents, directing that certain records be produced, but the witness failed to obey the command. In explanation the person so subpoenaed said that she thought the order was to bring the paper that had been served upon her. She claimed to have made inquiry of the serving deputy, who told her it would not be necessary to bring the Hospital records. The deputy denied this. However, the records were brought into court and the defendant was given an opportunity to examine them, hence prejudice cannot be predicated upon failure of the witness to obey the mandate. In fact, the court commented that there was no ulterior purpose.

Director Irene Thinness of the Polk County Welfare Department testified, over the plaintiff's objections, that Hydrick was approved for welfare aid in 1940 and throughout the years he had received amounts varying with authorized funds as they became available. For February, 1952, he received $48 and this continued through March, April, May, and June; but for July it was increased to $50. During January, 1952, welfare supplied funds for Hydrick's hospitalization. The director was out of the county when Hydrick was sent to the Hospital May 19th. It had been determined, however, that the applicant was afflicted with a chronic disease, and assistance is not given in these circumstances. In ruling on appellant's objections to most of the testimony given by the director, the court said: "Any official records of the welfare department that shed any light in this case should be made available to it."

The purpose of this testimony appears to have been directed to a contradiction of statements that Hydrick was Johnson's employe. But the witness testified that she did not make a personal investigation to ascertain the truth or falsity of the application for assistance, nor did she know of anyone who had. On hearsay and belief, however, the witness was confident that Hydrick "had never [since 1940] been employed for money." Her records showed that the old man was "not employable."

Appellant strenuously objected to the introduction of quorum court records showing that Polk county had made appropriations for the Hospital. The court's ruling was: "They are admissible. Let them be introduced with the right to substitute a copy of each exhibit." For 1950 the amount appropriated was $10,000; for 1951, $5,000; for 1952, $5,000; for 1953, $5,000, of which $1,500 was to pay a Hospital note, the remainder to be left in the county treasury. When claims were filed with statements attached they would be paid upon order of the county court. [Another paragraph appropriates $1,500 for the payment of November (1953) bills, but this may be the same item mentioned as a Hospital note.] The amount appropriated in 1954 was $5,000.

County Judge John Gordon, over defense objections, was permitted to testify that he endeavored to enlist welfare aid for Hydrick incidental to the May 19th hospitalization, but the director was not available and Mrs. Purtle, who was in temporary charge, did not have the authority to act. Judge Gordon was also allowed to testify that Johnson's reputation for honesty and integrity was good, but rejected testimony that the defendant's reputation for paying his debts was good. At no time was Johnson's reputation put in issue. Exceptions were saved to Gordon's statements.

The defendant testified at length. Hydrick, he said, came to Polk county about 45 years ago and settled on a farm adjoining the one he now owns. Hydrick lost his wife in 1937 or 1938. His daughter came from Arizona "and sold the place out from under the old man, then put him in a car and drove to Oklahoma and dumped him out with an old fellow named Craig." Hydrick wrote Johnson that he wanted to return to Polk county, where he could be buried by the side of his wife. But Hydrick, even then, was not physically able to do farm work. Johnson took him in, treated him as a member of the family, but did not at any time pay wages. He did not remember ever having seen one of Hydrick's welfare checks: Mrs. Johnson looked after such matters.

When Hydrick required medical attention May 19th Mrs. Johnson took him to the Hospital. Johnson went later and signed the admission blank, but did not know who filled it out. He was not notified that the Hospital authorities were unable to locate Mrs. Brewer. Although without information regarding charges for the room Hydrick occupied, he did go to the Hospital and saw that the patient had been moved. Had he known what the cost was Hydrick would have been taken to a private place operated by Mrs. Markel—a home for the aged.

Over plaintiff's objections Johnson was permitted to testify that before Hydrick was placed in the Hospital May 19th he talked with Judge Gordon "about getting help from the welfare." The Judge told him to put the

patient in the Hospital, "and if the welfare doesn't take care of him the county will." Burial expenses were paid with a welfare check.

Mrs. Gwendolyn P. Lewis, on behalf of the Hospital, testified that county appropriations are usually made to pay for equipment and supplies. Proceeds of a one mill tax are used for maintenance of the building, and upkeep. There is no appropriation for the payment of delinquent bills.

Since appellee's signature to the Record of Admission has been fully established, and in the absence of substantial testimony that it was procured through fraud, the issue is one of legal determination. The unqualified indorsement that "I hereby agree to pay for services rendered to this patient" can mean but one thing—a commitment by Johnson to pay the necessary charges if the patient or someone else did not. In all probability appellee felt that the welfare department would pay, or if that source of aid failed the county would supply the deficiency. But these were matters between Johnson and the agencies he thought could be relied upon for protection—a secondary undertaking with which the Hospital is not shown to have been concerned.

In this view of the case the incompetent evidence becomes unimportant, although if a factual issue in extenuation of Johnson's liability had been presented reversal of the judgment with remand of the cause for a new trial would have been imperative.

This is a case where a man whose charitable attitude and goodness of heart created a situation from which he cannot be legally extricated upon the basis of testimony offered. Because no effective defense was shown appellant's motion for judgment *non obstante veredicto* should have been sustained. The cause having been fully developed, judgment will be entered here. It is so ordered.

Reversed.

Mr. Justice MILLWEE did not participate in the consideration or determination of this case.